UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THOMAS RAGAS | CIVIL ACTION<br>NO. 17-9663 |
| VERSUS | |
| | DIVISION 1 |
| ESTATE OF JAMES SCHEXNAYDER, ET AL. | |
| | MAGISTRATE JUDGE<br>JANIS VAN MEERVELD |

ORDER AND REASONS

Before the Court is the Motion for Summary Judgment filed by the Estate of James Schexnayder. (Rec. Doc. 88). The plaintiff concedes that he has no evidence to show that Mr. Schexnayder caused his arrest, but he argues that the Estate may be liable because of statements made by Mr. Schexnayder's agents to the police or because Mr. Schexnayder did not "clear up" the alleged misstatements of his agents. As discussed further below, these latter theories fail as a matter of law. Accordingly, the Estate of James Schexnayder Motion for Summary Judgment is GRANTED.

Background

Plaintiff Thomas Ragas was arrested on September 26, 2016, in St. James Parish after he called the police to his business to report a break-in and the arresting officer determined that Mr. Ragas was wanted on an outstanding arrest warrant.   Mr. Ragas alleges that during his incarceration, prison officials refused to provide him with medication he needed causing him to suffer blackouts, falls, and critical injuries. Mr. Ragas alleges that on October 13, 2016, the State dismissed the charges against him and he was released. Of particular relevance to the present motion, Mr. Ragas alleges that he:

> was thereon told that Defendant, James Schexnayder, and/or his agents, were the
> parties who had placed the false charges against Petitioner and caused Petitioner's

1

arrest. James Schexnayder has since deceased and his estate, through administrator, Sonia Louque, is made a Defendant in this litigation. Petitioner has never been presented or produced any documents or statements of James Schexnayder.

Second Amended Complaint, Rec. Doc. 21, at ¶20. Mr. Ragas further alleges that:

James Schexnayder, if he in fact instituted charges, was negligent and/or falsely brought bogus charges against Petitioner, which caused Petitioner's arrest and incarceration, and lead to Petitioner's injuries and a denial of his freedom. Further, now that Defendant, James Schexnayder has deceased, Petitioner avers that his estate, through administrator, Sonia Louque, is liable for damages for false arrest and other tort damages under LA C.C.P. Art. 2315, et seq.

Id. ¶21.

Mr. Ragas filed this lawsuit on September 26, 2017, against Mr. Schexnayder; the Estate of Mr. Schexnayder; St. James Parish Sheriff, Willy Martin, Jr.; the St. James Parish Sheriff's Office; Officer Dustin Poche; and unnamed officers, prison medical providers, and insurance company. Trial is set to begin on January 19, 2020. The deadline to complete discovery passed on October 23, 2020.

The warrant for  Mr. Ragas' September 2016 arrest arises out of a February 12, 2016, incident when Mr. Ragas allegedly gave Mr. Schexnayder a controlled substance. A police report from the St. James Parish Sheriff's Office describes the incident. Mrs. Louque, who is Mr. Schexnayder's daughter, reported that:

her father has Dementia and she has Power of Attorney over him. Mrs. Louque stated Mr. Schexnayder took half of an unknown pill that was given to him by Thomas Ragas. . . . [W]hen she arrived at her father's residence Mr. Ragas was no longer at the residence. . . . [S]he received a telephone call from her sister Julia Trégre, stating Mr. Ragas was at her dad's residence and had given him a pill. [When Mrs. Louque arrived,] her nephew Justin Aubert was at the house. . . . . Mr. Aubert told her Mr. Ragas gave Mr. Schexnayder half of a pill and left the other half on the breakfast table. . . . [W]hen she went to check on Mr. Schexnayder he was sleepy and talking out of his head.

Pl.'s Ex. B, at 1. According to Ms. Louque, Mr. Schexnayder was not supposed to take any medication that was not prescribed to him. Id.  An ambulance was called to the residence and Mr. Schexnayder was transported to the East St. James Hospital. Id.

> The report also summarized the statement of Mr. Aubert, who reported that:

> when he arrived at his grandfather's Mr. Schexnayder's residence, Mr. Schexnayder and Mr. Ragas was sitting on the porch talking. Mr. Aubert stated that after about two hours of being at Mr. Schexnayder's residence, Mr. Schexnayder stated that his back was hurting. Mr. Aubert stated that Mr. Ragas had offered Mr. Schexnayder a back brace and said he would go and see if he had something to help with the pain. After Mr. Ragas returned from his car he offered Mr. Schexnayder an unknown pill and told him to take half. Mr. Aubert stated when Mr. Ragas left . . . Mr. Schexnayder's residence, he took the other half of the pill and called his mother Julia Trégre, out of concern for his grandfather Mr. Schexnayder.

Id. According to the police report, the pill was processed by the Louisiana State Police Crime Laboratory and the officer learned through research that the pill contained Naloxone and Pentazocine, a pain reliever and a Schedule IV controlled substance. Id.

Mr. Ragas testified that he was aware that Mr. Schexnayder was in end-stage dementia at the time of the alleged incident with the pill. Ragas Depo., Rec. Doc. 88-4, at 4. He understood that dementia means a person does not have capacity to make decisions or take care of himself in some instances. Id.  at 5-6. He was aware that Mr. Schexnayder's daughters were taking care of him and had heard that his daughter had legal power of attorney for him. Id.  at 6.

Mr. Ragas has submitted a declaration in which he asserts that Mr. Schexnayder twice admitted that "he knew the charges related to Ragas' giving him a pill were false and that he would contact the Sheriff's Department and straighten it out." Ragas Decl., Rec. Doc. 94-1, at 1. According to Ragas, he did not give Schexnayder any medication, but merely showed him the bottle of pain medicine so that Mr. Schexnayder could copy down the name. Id.  He asserts that Mr. Schexnayder took a pill out of the bottle and put it on the table. Id.  at 2. Mr. Ragas says he

broke it in half and put it back on the table stating that the pill was contaminated and he would not put it back in the bottle. Id.  He says that Mr. Schexnayder picked up half of the pill and put it in his mouth. Id.

Parties' Arguments

In the present motion for summary judgment, the Estate of Mr. Schexnayder argues that Mr. Ragas' claims against it must be dismissed because he cannot establish that Mr. Schexnayder made any allegation that caused Mr. Ragas' arrest. The Estate submits that the only allegation concerning Mr. Schexnayder in the Second Amended Complaint is inadmissible hearsay—that Mr. Ragas "was thereon told" that Mr. Schexnayder and/or his agents had placed false charges against Mr. Ragas. The Estate submits that in nearly three years of litigation, Mr. Ragas has not brought forth any evidence regarding who provided him with this information. The Estate notes that to the extent Mr. Ragas' allegations could implicate any "agents" of Mr. Schexnayder, such persons have not been named as defendants.  The Estate adds that in paragraph 21 of his Second Amended Complaint, Mr. Ragas avers that Mr. Schexnayder was negligent "if he in fact instituted charges," supporting the conclusion that Mr. Ragas has no evidence to show that Mr. Schexnayder instituted charges. Mr. Ragas also alleges that he "has never been presented or produced any documents or statements of James Schexnayder." Pl's Second Amended Complaint, Rec. Doc. 21, ¶20. The Estate argues that it is clear that Mr. Ragas has no evidence or reasonable belief that Mr. Schexnayder made any allegation whatsoever that caused Mr. Ragas' arrest.

Further, the Estate argues that even if Mr. Ragas had produced evidence of a genuine issue of dispute as to material facts regarding Mr. Schexnayder's liability, Mr. Ragas knew or should have known at all relevant times that Mr. Schexnayder was incompetent. Indeed, Mr. Ragas admitted in his deposition that Mr. Schexnayder had dementia and that this means a person does

4

not have capacity to make decisions or to take care of himself in some instances. Ragas Depo., Dec.'s Ex. 3, Rec. Doc. 88-4, at 4-6. He knew that Mr. Schexnayder's daughters were taking care of him and had heard that his daughter had power of attorney for him. Id. at 6.

Finally, the Estate argues that Mr. Ragas has confirmed that there is no genuine dispute that Mr. Ragas has no knowledge or evidence to establish the liability of Mr. Schexnayder. The Estate points out that in his deposition, Mr. Ragas conceded that he had no "personal knowledge that James Schexnayder made a complaint to the police or told anybody . . . that [Mr. Ragas] harmed him." Ragas Depo., Def.'s Ex. 2, Rec. Doc. 88-3, at 4. The Estate insists that on the record taken as a whole, no rational trier of fact could find for Mr. Ragas.

In his opposition memorandum, Mr. Ragas appears to concede there are no material facts presenting a genuine issue. Indeed, he admits that he "has no evidence that James Schexnayder caused his arrest." Pl.'s Opp., Rec. Doc. 94, at 2. Instead, he argues he has also alleged that an agent of Mr. Schexnayder might have made the allegation causing the arrest. He submits that the Estate does not deny that Mr. Schexnayder's agents did so and, as a result, he argues that summary judgment is not proper here. Citing the police report, Mr. Ragas submits that Mr. Schexnayder's daughter Sonia Louque and his grandson Justin Aubert are the agents of Mr. Schexnayder who made the allegations resulting in his arrest. Mr. Ragas agues that "it cannot be controverted or argued that at least Ms. Louque, holding a POA, was James' agent." Id. at 3.

Additionally, citing his own declaration, Mr. Ragas argues that Mr. Schexnayder twice admitted the charges were false and assured Mr. Ragas he would "straighten it out" with the Sheriff's Office. Mr. Ragas argues that two failures to straighten out the false charges "is tantamount to instituting them." Id. at 4.

In reply, the Estate submits that Mr. Ragas' opposition relies solely on a legally unsupported agency argument and a self-serving affidavit. The Estate argues that a self-serving affidavit is not persuasive summary judgment evidence. It responds to Mr. Ragas' argument that Mr. Schexnayder's failure to straighten things out with the Sheriff's department by stating that Mr. Ragas has described this fact as irrelevant because it was Mr. Schexnayder's agents that made the allegations. The Estate adds that Mr. Ragas admits that Mr. Schexnayder could not possess the mental capacity to make any coherent allegations.

The Estate also argues that contrary to Mr. Ragas' suggestion, it was not required to address what Mr. Ragas calls "the agent issue" because in three years of litigation, Mr. Ragas has failed to name any such agent as a defendant to these proceedings. The Estate further argues that even if an agent of Mr. Schexnayder alleged that Mr. Ragas provided a narcotic pain pill to Mr. Schexnayder, this falls short of an actionable offense. The Estate submits that even if Ms. Louque had been made a defendant to this proceeding, Mr. Ragas would not probably not be able to show that Mrs. Louque wrongfully made such allegations.

The Estate further argues that under Louisiana's law of mandate, Mr. Schexnayder and his estate cannot be liable for an alleged tortious false accusation made by his mandatary. Such an action, the Estate argues, would be far beyond the authority expressed by a general power of attorney. The Estate argues that Louisiana law does not impose vicarious liability for the tortious acts of another except in enumerated instances inapplicable here. The Estate argues that Mr. Schexnayder was only liable for acts of Sonja Louque that fell within the scope and authority of her general power of attorney. It insists that liability is not imposed for alleged tortious acts of Ms. Louque.

6

<u>Law and Analysis</u>

*1. Summary Judgment Standard*

Summary Judgment under Federal Rule of Civil Procedure 56 must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56. The movant has the initial burden of "showing the absence of a genuine issue as to any material fact." <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). The respondent must then "produce evidence or designate specific facts showing the existence of a genuine issue for trial." <u>Engstrom v. First Nat. Bank of Eagle Lake</u>, 47 F.3d 1459, 1462 (5th Cir. 1995). Evidence that is "merely colorable" or "is not significantly probative" is not sufficient to defeat summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

"An issue is material if its resolution could affect the outcome of the action." <u>Daniels v. City of Arlington, Tex.</u>, 246 F.3d 500, 502 (5th Cir. 2001). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249. Although this Court must "resolve factual controversies in favor of the nonmoving party," it must only do so "where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Antoine v. First Student, Inc.</u>, 713 F.3d 824, 830 (5th Cir. 2013) (quoting <u>Boudreaux v. Swift Transp. Co.</u>, 402 F.3d 536, 540 (5th Cir. 2005). The Court must not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).

"Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant." <u>Armstrong v. City of Dallas</u>,

997 F.2d 62, 67 (5th Cir. 1993). Summary judgment is also appropriate if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

### 2. Law of Mandate

"A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." La. Civ. Code art. 2989. "The principal is bound to perform the contract that the mandatary, acting within the limits of his authority, makes with a third person." Id. art. 3020.  If the agent acts outside the limits of his or her authority in effecting a transaction with a third person, the principal may nonetheless be bound if the principal has acted to give the third party a reasonable belief that the agent had the authority to act on the principal's behalf. Hanover Ins. Co. v. Plaquemines Par. Gov't, No. CIV.A. 12-1680, 2015 WL 4394079, at *3 (E.D. La. July 15, 2015).  The person seeking to bind the principal bears the burden of proving such apparent authority. Id. Indeed, "an agency relationship cannot be presumed, it must be clearly established." Richard A. Cheramie Enterprises, Inc. v. Mt. Airy Ref. Co., 708 F.2d 156, 158 (5th Cir. 1983).

Under Louisiana law, "[l]iability for the tortious conduct of an agent does not flow from the principal-agent relationship." Pinero v. Jackson Hewitt Tax Serv. Inc., 638 F. Supp. 2d 632, 640 (E.D. La. 2009); Urbeso v. Bryan, 583 So. 2d 114, 117 (La. Ct. App. 1991) ("Liability for the tortious or negligent conduct of another does not flow because of a principal-agent relationship."). The Louisiana Supreme Court has explained that while an employer is liable for the tortious conduct of an employee or servant within the scope of authority or employment,[1] "a principal is

---

[1] "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." La. Civ. Code art. 2317. "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise

not liable for the physical torts of a non-servant agent." <u>Rowell v. Carter Mobile Homes, Inc.</u>, 500 So. 2d 748, 751 (La. 1987). "Only when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance which is characteristic of the relation of master and servant does the person in whose service the act is done become subject to liability for the physical tortious conduct of the actor." <u>Id.</u>; see <u>Bartholomew v. CNG Producing Co.</u>, 832 F.2d 326, 329 (5th Cir. 1987) ("[A] principal is liable for the acts of an independent contractor if he exercises operational control over those acts or expressly or impliedly authorizes an unsafe practice.")

The requirement of control similarly applies where the tort is not physical. In <u>Pinero</u>, for example, the plaintiff sought to hold a franchisor liable for invasion of privacy resulting from the actions of an employee of the franchisee, who had allegedly thrown away the plaintiff's tax returns. 638 F. Supp. 2d at 639-40. The court dismissed the invasion of privacy claim against the franchisor, finding that plaintiff had failed to allege any facts indicating that the franchisor controlled the franchisee's employee in the performance of her job. <u>Id.</u> at 641.

*3. Mr. Ragas' Claims against the Estate of Mr. Schexnayder*

Mr. Ragas concedes that he has no evidence that Mr. Schexnayder caused his arrest. Instead, he insists that his claim cannot be dismissed based on one of two theories. First, he argues that Mr. Schexnayder is liable for the acts of his agents in falsely making a police report that resulted in his arrest. Second, he argues that Mr. Schexnayder is liable because he told Mr. Ragas he would clear up the false allegations made to the Sheriff's Department, but he never did so.

---

of the functions in which they are employed"  only if the master or employer "might have prevented the act which caused the damage, and have not done it." <u>Id.</u>  art. 2320.

With regard to the first theory, there are no facts in dispute. The argument is purely legal: Can the Estate of Mr. Schexnayder be held liable for the allegedly false reports made to the police by Ms. Louque and Mr. Aubert. As discussed above, the principal-agent relationship is not enough, on its own, to result in a principal's liability for the tortious acts of his agent. With regard to Mr. Aubert, Mr. Ragas has advanced no basis for finding that he is an agent, let alone an agent akin to an employee of Mr. Schexnayder.

As to Ms. Louque, Mr. Ragas argues simply that she was holding a power of attorney for Mr. Schexnayder and that, accordingly, there is no question that she is an agent. Mr. Ragas does not present any evidence that Mr. Schexnayder had the ability to control Ms. Louque's performance of her duties pursuant to a power of attorney similar to the relationship between an employer and employee. Instead, the evidence indicates that Ms. Louque was a caretaker for Mr. Schexnayder and that she had a power of attorney over his affairs. This is insufficient to even suggest that Mr. Schexnayder had a level of control over Ms. Louque to the point that he could be held liable for any tortious acts of Ms. Louque in allegedly providing the Sheriff's Office with false information about Mr. Ragas. Mr. Ragas' claim against the Estate of Mr. Schexnayder on the basis of an agency theory must be dismissed.

With regard to Mr. Ragas' second theory, the only fact that may be in dispute is whether Mr. Schexnayder twice told Mr. Ragas that he would clear up the false allegations made to the Sheriff's department and then failed to do so. The Estate correctly points out that a "conclusory, self-serving statement" has been held insufficient to prevent summary judgment. BMG Music v. Martinez, 74 F.3d 87, 91 (5th Cir. 1996) (holding that defendant could not defeat summary judgment with only his "conclusory, self-serving statement" in support of his theory when "[t]he record contains no other evidence to overcome the strong inference of fraud raised by [defendant's]

admissions"); <u>Cenac Marine Servs., LLC v. Clark</u>, No. CV16150291615256, 2017 WL 1511760, at *2 (E.D. La. Apr. 27, 2017) (rejecting plaintiff's attempt to defeat summary judgment on his unseaworthiness claim by submitting a newly prepared "self-serving affidavit" describing the unseaworthiness of the vessel when the plaintiff testified in deposition and stated in his accident report that the accident was not caused by unfit or unreasonable equipment  or other workers aboard the vessel"). In the <u>BMG</u> and <u>Cenac</u> cases cited by the Estate, the parties resisting summary judgment evidence sought to contradict their own prior statements by submission of an affidavit. Similarly here, Mr. Ragas admitted in deposition that he had no knowledge that Mr. Schexnayder had caused his arrest. He did not, at that time, assert that Mr. Schexnayder had agreed to but then failed to correct statements made by Ms. Louque and Mr. Aubert. Mr. Ragas cannot defeat summary judgment with a self-serving declaration that seems to contradict his sworn deposition testimony.

Moreover, even if the court considered this statement, the court finds that it is not sufficient to defeat summary judgment. Mr. Ragas has presented no legal basis upon which the Estate of Mr. Schexnayder could be held liable for Mr. Schexnayder's failure to clear up allegedly false statements made by others to the Sheriff's Department. As discussed above, there is no evidence tending to show that Mr. Schexnayder had control over Ms. Louque or Mr. Aubert such that Mr. Schexnayder could be held responsible for their allegedly false reports to the Sheriff's Department. Mr. Ragas has presented no evidence or law to suggest that Mr. Schexnayder had an obligation to correct any statements by them. [2] His bare assertion that failing to contact the Sheriff's office to

---

[2] To the extent Mr. Ragas is now attempting to assert some type of claim for detrimental reliance upon the promises of Mr. Schexnayder, such a claim was not plead. "Detrimental reliance requires (1) a representation by conduct or word, (2) justifiable reliance on the representation, and (3) a change in position to the plaintiff's detriment as a result of the reliance." <u>Caplan v. Ochsner Clinic, L.L.C.</u>, 799 F. Supp. 2d 648, 651 (E.D. La. 2011) (quoting <u>Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.</u>, 376 F.3d 399, 403 (5th Cir. 2004)). The court expresses no opinion as to the merit of any such claim, but notes that Mr. Ragas has not plead any facts or produced any evidence to show a justifiable reliance or a change in position resulting from the purported promises. Indeed, the

correct alleged misstatements made by others is "tantamount to instituting them" is simply not supported. Thus, Mr. Ragas' claims against Mr. Schexnayder on this theory must also be dismissed.

Conclusion

Mr. Ragas has no evidence that Mr. Schexnayder made any statements resulting in his arrest. His alternate theory based in agency and a belated theory regarding purported assurances by Mr. Schexnayder are not supported by law or fact. Accordingly, the Estate of Mr. Schexnayder is entitled to summary judgment dismissing Mr. Ragas' claims against it WITH PREJUDICE. Mr. Schexnayder's Motion for Summary Judgment (Rec. Doc. 88) is GRANTED.

New Orleans, Louisiana, this 6th day of November, 2020.

Janis van Meerveld
United States Magistrate Judge

---

evidence shows that Mr. Ragas knew Mr. Schexnayder had end stage dementia, which he understood to mean "that a person does not have capacity to make decisions or take care of himself in some instances." Moreover, even if such a promise had been made and Mr. Ragas had been justified in relying on it, Mr. Ragas would have known about it at the time the original complaint was filed and he has presented no reason why he could not have asserted such a claim earlier.